**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| CTC TRANSPORTATION | : | |
| INSURANCE SERVICES, LLC, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 20-6228 (FLW) (LHG) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| QBE INSURANCE CORPORATION, | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

**WOLFSON, Chief Judge:**

      Plaintiffs CTC Transportation Insurance Services, LLC ("CTC California"), CTC Transportation Insurance Services of Missouri, LLC ("CTC Missouri"), CTC Transportation Insurance Services of Hawaii, LLC ("CTC Hawaii") (together, the "CTC Plaintiffs"), and Thomas Mulligan ("Mulligan") (collectively "Defendants"), filed this insurance coverage action against Defendants QBE Insurance Corporation ("QBE"), Capital Specialty Insurance Corporation ("Capital"), Argo Group US, Inc. ("Argo"), Argonaut Insurance Company ("Argonaut"), Peleus Insurance Company ("Peleus")[1], Axis Surplus Insurance Company ("Axis"), and Maxum Indemnity Company ("Maxum") (collectively, "Defendants"). Plaintiffs allege that Defendants, with whom Plaintiffs have contracts for commercial insurance coverage, failed to defend Plaintiffs in connection with a lawsuit filed against Plaintiffs in the Eighth Judicial District Court of the State of Nevada, Clark County, entitled, *Barbara D. Richardson In Her Capacity as the Statutory*

---

[1]      The Court refers to Argo, Argonaut, and Peleus, together, as "the Argo Defendants."

*Receiver for Spirit Commercial Auto Risk Retention Group, Inc. v. Thomas Mulligan, et al.* (the "*Spirit Receivership* Action"). Pending before the Court are three separate motions for judgment on the pleadings filed pursuant to Federal Rule of Civil Procedure 12(c) by QBE, the Argo Defendants, and Capital. QBE's motion has been joined by Axis and Maxum. Plaintiffs oppose the motions and, additionally, have filed a cross-motion for partial summary judgment on QBE's duty to defend Plaintiffs in the *Spirit Receivership* Action, or, in the alternative, for leave to amend the Complaint. For the reasons set forth herein, the Motions for Judgment on the Pleadings filed by QBE, the Argo Defendants, and Capital are **DENIED**. The Motions for Joinder of QBE's Motion for Judgment on the Pleadings filed by Axis and Maxum are **GRANTED**. Plaintiffs' Cross-Motion for Partial Summary Judgment is **DENIED**.[2]

## I.  BACKGROUND

The CTC Plaintiffs are limited liability companies that operated as program administrators and general managing agents for insurance companies. (Pls.' SUMF ¶ 18.) Mulligan is the Chief Executive Officer of each of the CTC Plaintiffs. (*Id.* ¶ 19.) The CTC Plaintiffs previously served as program administrators for Spirit Commercial Auto Risk Retention Group, Inc. ("Spirit"). (*Id.* ¶ 20.) Specifically, CTC California served as Program Administrator for Spirit from 2011 to 2016 and, in that capacity, underwrote and issued Spirit's insurance policies pursuant to a Program Administrator Agreement (the "PAA"). (*Id.* ¶ 23; *see also Spirit Receivership* Compl., ECF No. 13-6, ¶ 11.) In 2016, CTC California assigned the PAA to CTC Missouri and, on June 29, 2016, the Nevada Division of Insurance approved an amendment agreement between CTC Missouri and Spirit (the "CTC Agreement"). (Pls.' SUMF ¶ 24.) Pursuant to the CTC Agreement, CTC

---

[2]  In their cross-motion Plaintiffs additionally seek leave to amend the Complaint if the Court is inclined to grant any portion of QBE's motion. Because the Court denies QBE's motion for judgment on the pleadings, I need not address Plaintiffs' proposed amendments to the Complaint.

Missouri agreed to be responsible for (1) the marketing and underwriting of policies; (2) soliciting business through "insurance brokers and licensed independent insurance agents"; and (3) all related activities incidental to the issuance of policies, including collecting and paying to Spirit all premiums due on business written pursuant to the agreement. (*Id.* ¶ 25.) CTC Hawaii never executed a formal contract with Spirit, but is affiliated with CTC California and CTC Missouri. (*Spirit Receivership* Compl., ECF No. 13-6, ¶ 13.)

In 2019, the CTC Plaintiffs each purchased a multi-layered insurance program with policy periods of March 20, 2019 to March 20, 2020. (Compl. ¶ 2.) QBE issued the CTC Plaintiffs their primary layers of coverage, with total limits, respectively, up to $5 million per professional liability claim. (Compl. ¶¶ 26, 39, 52.) The insurance programs of each of the CTC Plaintiffs has four excess layers that "follow form" to the Primary Policy. (*Id.* ¶¶ 27, 40, 53.) Each of the CTC Plaintiffs obtained a first excess layer policy from Capital, which has a limit of liability of $5 million in excess of $5 million. (*Id.*) The second excess layer was obtained by each CTC Plaintiff from Argo, Argonaut, and/or Peleus, and have limits of liability of $5 million in excess $10 million. (*Id.* ¶¶ 28, 41, 54.) The third excess layer was obtained from Axis with limits of liability of $5 million excess of $15 million. (*Id.* ¶¶ 29, 42, 55.) The fourth excess layer was obtained from Maxum with limits of liability of $5 million in excess of $15 million. (*Id.* ¶¶ 30, 43, 56.)

### A. The Primary Policies

The CTC Plaintiffs each purchased separate "Insurance Agents and Brokers Errors and Omissions Liability Insurance" policies from QBE for the policy period March 20, 2019 to March 20, 2020 (the "Primary Policies"). (*Id.* ¶¶ 25, 39, 52.) The terms of the Primary Policies are identical. Relevant here, the Primary Policies' insuring agreement for Errors and Omissions Coverage states:

The Insurer shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in Item 5.a. and 5.b. of the Declarations which the **Insured** shall become legally obligated to pay as **Damages** as a result of a **Claim** first made against the **Insured** and reported to the Insurer during the **Policy Period**, Automatic Extended Reporting Period, or Optional Extended Reporting Period, if exercised, by reason of a **Wrongful Act** in the performance of **Professional Services** rendered or that should have been rendered by the **Insured** or by any other person or organization for whose **Wrongful Act** the **Insured** is legally responsible, provided the **Wrongful Act** occurs during the **Policy Period** or on or after the Retroactive Date stated in Item 6. Of the Declarations and before the end of the **Policy Period**.

(*Id.*, Ex. 1.)[3] The term "Insured" is defined as the CTC Plaintiffs themselves, as well as their current or former directors, officers, managers, employees, and independent contractors. (*Id.*)

"Professional Services" is defined as:

the following services rendered by the **Insured** for others or acting as:

1. Insurance Wholesaler
2. Insurance Managing General Agent;
3. Insurance General Agent;
4. Insurance Underwriting Manager;
5. Insurance Program Administrator;
6. Insurance Agent;
7. Insurance Broker;
8. Insurance Surplus Lines Broker;
9. Insurance Consultant;
10. Insurance Claims Administrator;
11. Insurance Appraiser;
12. Insurance Premium Financier;
13. Notary Public;
14. Life and/or Health Agent or Broker;
15. Lecturer, speaker, instructor or teacher at any Insurance convention or at any other meeting or course where approved Department of Insurance continuing education credits may be earned;
16. Expert witness concerning any Insurance related subject;
17. Employee Benefit Consultant; or
18. Loss Control or Risk Manager, concerning any Insurance

---

[3]     All bolded words are bolded in the Policy.

4

related subject.

(*Id.*, Section XII.N.1–18.)

The Primary Policies additionally include a provision entitled "Defense, Settlements and

Claim Expenses." (*Id.*, Section I.B.) That provision states:

> The Insurer shall have the right and duty to defend and investigate any **Claim** to which coverage under this policy applies pursuant to the following:
>
> (a) **Claim Expenses** incurred in defending and investigating such **Claim** shall be in addition to the Limits of Liability stated in Item 4. of the Declarations. Such **Claim Expenses** shall not reduce the Limits of Liability and shall not be applied against the Deductible.

(*Id.*, Section I.B.1.a.)

The Primary Policies also include several exclusions from coverage. Relevant here are the

Business Enterprise Exclusion and the Insolvency Exclusion. The Business Enterprise Exclusion

provides that QBE will not provide coverage for any claim

> based upon or arising out of **Professional Services** performed for any organization if at the time the **Professional Services** were rendered:
>
> 1. any **Insured** operated or managed such organization other than the Named Insured;
>
> 2. any **Insured** was a principal, partner, officer, director, trustee, member, manager or employee of such organization;
>
> 3. any **Insured** owned, directly or indirectly, ten percent (10%) or more if such organization is publicly held or thirty percent (30%) or more if such organization is a privately held organization;
>
> 4. such organization directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the Named Insured.

(*Id.*, Section III.D.) Professional Services is defined by the Primary Policies as

the following services rendered by the **Insured** for others or acting as:

1. Insurance Wholesaler;

2. Insurance Managing General Agent;

3. Insurance General Agent;

4. Insurance Underwriting Manager;

5. Insurance Program Administrator;

6. Insurance Agent;

7. Insurance Broker;

8. Insurance Surplus Lines Broker

9. Insurance Consultant;

10. Insurance Claims Administrator;

11. Insurance Appraiser;

12. Insurance Premium Financier;

13. Notary Public:

14. Life and/or Health Agent Broker;

15. Lecturer, speaker, instructor or teacher at any Insurance convention or at any other meeting or course where approved Department of Insurance continuing education credits may be earned;

16. Expert witness concerning any Insurance related subject[;]

17. Employee Benefit Consultant; or

18. Loss Control or Risk Manager, concerning any Insurance related subject.

(*Id.*, Section XII.N.)  The Insolvency Exclusion provides that the Primary Policies will not provide

coverage for any claim

based upon or arising out of the insolvency, receivership, bankruptcy, liquidation or financial inability to pay, of any insurance Insurer, reinsurer, risk retention group or captive (or any other self-insurance plan or trust by whatsoever name) in which the **Insured** has placed *or* obtained coverage for a client or any account; provided, however, this exclusion shall not apply if at the time the **Insured** placed the insurance with the above described entity, such entity:

1.      held an A.M. Best rating of B+ or higher, or a Demotech rating of A or higher; or

2.      was guaranteed or operated by a governmental body

or bodies.

(*Id.*, Section III.L (emphasis added).)

## B. The *Sprit Receivership* Action

Spirit was an association captive insurance company that transacted commercial auto liability insurance business and specialized in serving commercial truck owners. (*Spirit Receivership* Compl. ¶¶ 6, 8, ECF No. 13-6.) Spirit was placed into receivership on February 27, 2019, by the Eighth Judicial District Court of Clark County, Nevada, based on its insolvency and failure to cure its financial deficiencies. (*Id.* ¶ 9.) On November 6, 2019, Spirit was placed into liquidation. (*Id.*) On February 6, 2020, Barbara D. Richardson, in her capacity as the statutory receiver for Spirit filed the *Sprit Receivership* Action against various defendants, including the CTC Plaintiffs, in Nevada.[4] (Compl. ¶ 64.)

The *Spirit Receivership* "complaint arises out of a vast [allegedly] fraudulent enterprise orchestrated by [Mulligan] and others, by which the Defendants operated a multitude of interrelated companies in the insurance service industry for their own benefit and to the detriment of their customers and insureds, including Spirit." (*Id.* ¶ 1.) The *Spirit Receivership* Complaint asserts the following causes of action against the CTC Plaintiffs and Mulligan: (1) breach of contract, (2) breach of fiduciary duty, (3) breach of the implied covenant of good faith and fair dealing, (4) violations of the Nevada Racketeer Influenced and Corruption Act, (5) unjust enrichment, (6) fraud, and (7) civil conspiracy. (*Id.* ¶¶ 263–68, 286–92, 300–19, 327–79.)

On February 6, 2020, Plaintiffs tendered their claims to all Defendants for coverage for the *Spirit Receivership* Action. (Compl. ¶ 72.) On March 17, 2020, QBE informed Plaintiffs that it

---

[4] It appears that the *Spirit Receivership* Action has since been dismissed and referred to arbitration. (*See* Pls.' Opp., at 3.)

would not be providing coverage to Plaintiffs based on the Business Enterprise and Insolvency Exclusions set forth in the relevant policies. (*Id.* ¶ 79.) Thereafter, on May 8, 2020, Maxum wrote to Plaintiffs and informed them that it would be denying coverage for the *Sprit Receivership* Action because (1) "Maxum, as an excess insurer to the primary QBE policies, has no obligation to provide any coverage for a claim prior to the exhaustion of the underlying limits of insurance provided by the underlying policies, (2) "Maxum's coverage is no broader than that afforded by QBE's primary policies," and (3) "[g]iven QBE's denial of coverage under its primary policies, there can be no coverage available for this matter under the Maxum excess policies." (*Id.* ¶ 83.) Capital, Argo, Argonaut, Peleus, and AXIS have not yet made coverage determinations with respect to the *Spirit Receivership* Action. (*Id.* ¶ 87.)

### C. Procedural History

Plaintiffs filed the instant Complaint on May 21, 2020. Plaintiffs assert that QBE and Maxum, by denying coverage, have breached the relevant insurance policies by failing to indemnify or defend Plaintiffs in the *Spirit Receivership* Action. (*Id.* ¶¶ 88–93.) Plaintiffs further seek a declaratory judgment against all Defendants stating that "Defendants must defend the Policyholders in the [*Spirit Receivership* Action]." (*Id.* ¶¶ 94–103.) On November 25, 2020, QBE filed the instant motion for judgment on the pleadings. (ECF No. 38.) The Excess Insurers join QBE's motions as, they contend, the Excess Policies follow form to the Primary Policies and, likewise, preclude coverage for the *Spirit Receivership* Action. (*See* ECF Nos. 39, 40, 41, 42.) Plaintiffs oppose the motions and, further, have filed a cross-motion for partial summary judgment on the question of whether QBE has a duty to defend Plaintiffs in the *Spirit Receivership* Action. (ECF No. 47.) Alternatively, if the Court is inclined to grant any portion of QBE's motion, Plaintiffs seek leave to amend the Complaint. (*Id.*)

## II.    LEGAL STANDARDS

### A.  Rule 12(c) Standard

Rule 12(c) of the Federal Rules of Civil Procedure provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The applicable standard on a motion made pursuant to Rule 12(c) is similar to that applied on a motion to dismiss pursuant to Rule 12(b)(6).  *See Spruill v. Gillis*, 372 F.3d 218, 223 n. 2 (3d Cir.2004); *Newton v. Greenwich Twp.*, No. 12-238, 2012 WL 3715947, at *2 (D.N.J. Aug. 27, 2012) ("The difference between a motion to dismiss pursuant to Rule 12(b)(6) and Rule 12(c) is only a matter of timing and the Court applies the same standard to a Rule 12(c) motion as it would to a Rule 12(b) (6) motion.") (citing *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)).  Thus, when reviewing a motion made pursuant to Rule 12(c), a court "view[s] the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the plaintiff."  *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 253 (3d Cir. 2004) (quoting *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir. 2002)); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (pursuant to Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief") (citation omitted).  Furthermore, a motion for judgment on the pleadings "should not be granted 'unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law.'"  *Mele*, 359 F.3d at 253 (quoting *Leamer*, 288 F.3d at 535)).

### B. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable [factfinder] could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the

nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III. DISCUSSION

### A. Applicable Law

First, the parties dispute which state's law applies to this matter. Specifically, QBE contends that because the CTC California Policy was issued to an entity principally located in California, the CTC Hawaii Policy was issued to an entity principally located in Hawaii, and the CTC Missouri Policy was issued to an entity principally located in Missouri; California, Hawaii, and Missouri law, respectively, should apply to Plaintiffs' claims. Plaintiffs, however, maintain that New Jersey law governs this dispute as there is no conflict between the law of New Jersey and the laws of California, Missouri, and Hawaii. (Pls.' Opp., at 12 n.4.)

A district court sitting in diversity jurisdiction applies the law of the forum state, including its choice of law principles. *Woessner v. Air Liquide Inc.*, 242 F.3d 469, 472 (3d Cir. 2001). Under New Jersey law, the first step in the conflicts analysis is to determine "whether there is an actual conflict between the laws of the states with interests in the litigation." *Continental Ins. Co. v. Honeywell Int'l, Inc.*, 234 N.J. 23, 46 (2018). For an actual conflict to exist there must be a "substantive difference" between the laws of the relevant states. *Id.* "If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue." *Id.* (quoting *Rowe v. Hoffman-La Roche, Inc.*, 189 N.J. 615, 621 (2007)); *see also Schwartz v. Hilton Hotels Corp.*, 639 F. Supp. 2d 467, 471 (D.N.J. 2009). Here, the parties do not dispute that there is no conflict between the laws of New Jersey, California, Hawaii, and Missouri, and, indeed, an independent review revealed that there is no conflict. (*See* QBE Moving Br., at 19; Pls.' Opp., at 12 n.4.) Nevertheless, QBE confusingly argues that the laws of California, Hawaii, and Missouri, respectively, should apply to the claims brought by the CTC Plaintiffs. I disagree. If there is no conflict amongst the potentially applicable laws, I need not engage in a choice of law analysis but, rather, it is appropriate to simply apply the law of the forum state. *See Warriner v. Stanton*, 475 F.3d 497, 501 (3d Cir. 2007); *Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006); *Argush v. LPL Financial, LLC*, Nos. 13-7821, 14-955, 14-956, 2016 WL 7424260, at *4 (D.N.J. Dec. 23, 2016). Accordingly, because there is no actual conflict of law, I analyze Plaintiffs' claims under New Jersey law.

### B. Whether QBE has a Duty to Defend Plaintiffs

At the outset, QBE does not dispute that the *Spirit Receivership* "is based upon and arises out of Professional Services performed for Spirit." (*See* Pl. SUMF ¶ 41; QBE's Resp. to Pls. SUMF ¶ 41.) Rather, QBE maintains that it has no obligation to defend Plaintiffs in the *Spirit*

*Receivership* Action because, it argues, coverage is barred by both the Business Enterprise and Insolvency Exclusions. Plaintiffs, however, argue that neither exclusion applies and, accordingly, have filed a cross-motion for summary judgment on the issue of whether QBE has a duty to defend Plaintiffs in the *Spirit Receivership* Action.[5]

### i. General Principles of Insurance Coverage under New Jersey Law

This dispute requires evaluation of the principles governing an insurance carrier's duty to defend its insured. An "insurer's duty to defend is typically broader than its duty to indemnify." *Grand Cove II Condo Ass'n, Inc. v. Ginsberg*, 291 N.J. Super. 58, 71 (App. Div. 1996). For example, "if there are multiple claims alleged, only one of which is potentially covered, the duty to defend will continue until every covered claim is disposed." *Villa Enterprises Mgmt. Ltd. v. Federal Ins. Co.*, 360 N.J. Super. 166, 186–87 (Law Div. 2002).

Under New Jersey law, "an insurance company has a duty to defend when an underlying complaint against the insured 'states a claim constituting a risk insured against.'" *Navigators Specialty Ins. Co. v. inVentiv Health Clinical, Inc.*, 826 F. App'x 199, 202 (3d Cir. 2020) (quoting *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165 (1992)). In other words, an insurance carrier "is contractually obligated to provide the insured with a defense against all actions covered by the insurance policy." *Abouzaid v. Mansard Gardens Assocs., LLC*, 207 N.J. 67, 79 (2011). In determining whether a duty to defend exists, courts compare "the allegations set forth in the complainant's pleading and the language of the insurance policy." *Flomerfelt v. Cardiello*, 202

---

[5]     Because the Excess Policies "follow form" to the Primary Policies, the Court's analysis of the Insolvency and Business Enterprise Exclusions applies equally to the motions filed by Capital, Maxum, the Argo Defendants, and Axis. *See Houbigant, Inc. v. Federal Ins. Co.*, 374 F.3d 192, 205 (3d Cir. 2004) (noting that under a follow form excess policy "the parties agree that the coverage issues presented turn solely on the interpretation of the underlying polic[y]" (alteration in original).

N.J. 432, 444 (2010).  If the complaint raises allegations that fall within a risk covered by the insurance contract, then "the duty to defend arises, irrespective of the claim's actual merit." *Voorhees*, 128 N.J. at 173.  Nonetheless, in determining whether a duty to defend has been triggered, a court's analysis "is not necessarily limited to the facts asserted in the complaint," *Abouzaid*, 207 N.J. at 81, and may include "extrinsic facts, outside of the complaint, which are later revealed in discovery."  *S.T. Hudson Engineers, Inc. v. Pa. Nat. Mut. Cas. Co.*, 388 N.J. Super. 592, 606 (App. Div. 2006).

The determination of "the proper coverage of an insurance contract is a question of law." *Buczek v. Cont'l Cas. Ins. Co.*, 378 F.3d 284, 288 (3d Cir. 2004) (citing *Atl. Mut. Ins. Co. v. Palisades Safety & Ins. Ass'n*, 364 N.J. Super. 599, 604 (App. Div. 2003)).  "An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled."  *Flomerfelt*, 202 N.J. at 441.  However, because insurance policies are contracts of adhesion, they "are subject to special rules of interpretation," *Longobardi v. Chubb Ins. Co. of N.J.*, 121 N.J. 530, 537 (1990), and "courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness."  *Voorhees*, 128 N.J. at 175; *see Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 594 (2001) ("We give special scrutiny to insurance contracts because of the stark imbalance between insurance companies and insureds in their respective understanding of the terms and conditions of insurance policies.").  In a dispute over the interpretation of an insurance contract, the "burden is on the insured to bring the claim within the basic terms of the policy."  *Reliance Ins. Co. v. Armstrong World Indus., Inc.*, 292 N.J. Super. 365, 377 (App. Div. 1996).  However, where, as here, "the insurance carrier claims the matter in dispute falls within exclusionary provisions of the policy, it bears the burden of establishing that claim."  *Rosario ex rel. Rosario v. Haywood*, 351 N.J. Super 521, 530 (App. Div. 2002).

In New Jersey, the court's function in construing policies of insurance, as with any other contract, "is to search broadly for the probable common intent of the parties in an effort to find a reasonable meaning in keeping with the express general purposes of the policies." *Royal Ins. Co. v. Rutgers Cas. Ins. Co.*, 271 N.J. Super. 409, 416 (App. Div. 1994). In most cases, the best indication of the parties' reasonable expectations lies in the language of the insurance policy itself, *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997), and thus, ordinarily, "the words of an insurance policy are to be given their plain, ordinary meaning." *Zacarias*, 168 N.J. at 595. In that regard, "[w]here the express language of the policy is clear and unambiguous, 'the court is bound to enforce the policy as it is written.'" *Rosario*, 351 N.J. Super. at 530 (quoting *Royal Ins.*, 271 N.J. Super. at 416); *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008) ("If the language is clear, that is the end of the inquiry."). This governing principle precludes courts from writing "'for the insured a better policy of insurance than the one purchased.'" *Gibson v. Callaghan*, 158 N.J. 662, 670 (1999) (citation omitted).

Additionally, in the context of an insurance policy, "[e]xclusionary clauses are presumptively valid and are enforced if they are 'specific, plain, clear, prominent, and not contrary to public policy.'" *Flomerfelt*, 202 N.J. at 441 (quoting *Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 95 (1997)). Because the burden is on the insurer to bring the case within an exclusion, *Chunmuang*, 151 N.J. at 95, "exclusions are ordinarily strictly construed against the insurer, and if there is more than one possible interpretation of the language, courts apply the meaning that supports coverage rather than the one that limits it." *Flomerfelt*, 202 N.J. at 442 (internal citation omitted). Nonetheless, "[i]f the words used in an exclusionary clause are clear and unambiguous, 'a court should not engage in a strained construction to support the imposition of liability.'" *Id.* (quoting *Longobardi*, 121 N.J. at 537). In that regard, courts cannot "disregard the 'clear import

and intent' of a policy exclusion," *Am. Motorists Ins. Co. v. L–C–A Sales Co.*, 155 N.J. 29, 41 (1998) (citation omitted), and "[f]ar–fetched interpretations of a policy exclusion are insufficient to create an ambiguity requiring coverage." *Essex Ins. Co. v. New Jersey Pan–African Chamber of Commerce & Indus., Inc.*, No. A–1237–14T3, 2017 WL 4051726, at *3 (N.J. Super. Ct. App. Div. Sept. 14, 2017). "Rather, courts must evaluate whether, utilizing a 'fair interpretation' of the language, it is ambiguous." *Flomerfelt*, 202 N.J. at 442 (quoting *Stafford v. T.H.E. Ins. Co.*, 309 N.J. Super. 97, 105 (App. Div. 1998)).

### ii. *The Insolvency Exclusion*

QBE contends that coverage is precluded by the Insolvency Exclusion. The CTC Primary Policies provide exclude coverage for any claim

> based upon or arising out of the insolvency, receivership, bankruptcy, liquidation or financial inability to pay, of any insurance Insurer, reinsurer, risk retention group or captive (or any other self-insurance plan or trust by whatsoever name) in which the **Insured** has placed or obtained coverage for a client or an account; provided, however, this exclusion shall not apply if at the time the **Insured** placed the insurance with above described entity, such entity:
>
> 1.    held an A.M Best rating of B+ or higher, or a Demotech rating of A or higher; or
>
> 2.    was guaranteed or operated by a governmental body or bodies.

(Compl., Ex. 1, Section III.L.) QBE argues that this exclusion applies to Plaintiffs' claim for coverage "because the *Spirit Receivership* Action is expressly based upon and arises out of Spirit's receivership, insolvency and liquidation of a risk retention group." (QBE Moving Br., at 37.) Plaintiffs, however, maintain that the Insolvency Exclusion is ambiguous and, moreover, does not preclude coverage for the *Spirit Receivership* Action.

Insolvency exclusions, such as the one at issue here, are widely enforced both in New Jersey and throughout the United States. *See, e.g.*, *Criterion Claim Solutions, Inc. v. Scottsdale Indemnity Co.*, No. 20-6225, 2021 WL 794787 (D.N.J. Mar. 1, 2021) (enforcing insolvency exclusion under New Jersey law);[6] *ACE Capital Ltd. v. Morgan Waldon Ins. Mgmt., LLC*, 832 F. Supp. 2d 554, 568–72 (E.D. Pa. 2011); *Zurich Specialties London Ltd. v. Bickerstaff, Whatley, Ryan & Burkhalter, Inc.*, 650 F. Supp. 2d 1064, 1070–71 (C.D. Cal. 2009); *American Auto. Ins. Co. v. Valentine*, 131 F. App'x 406, 411 (4th Cir. 2005) ("In sum, we conclude that the exclusionary clause relating to insolvency unambiguously bars coverage of the broker's claims stemming from the underlying suits. . . ."). Application of an insolvency exclusion turns on the interpretation of the exclusion's prefatory language: "based upon or arising out of." *See Criterion Claims Solutions*, 2021 WL 794787, at *5–6. The New Jersey Supreme Court has instructed that "arising out of" should be given a broad definition and "has been read expansively to define the link between the conduct and the covered activity as 'originating from,' 'growing out of' or having a 'substantial nexus.'" *Flomerfelt*, 202 N.J. at 452 (quoting *Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 155 N.J. 29, 34 (1998)). In other words, "[t]here need be shown only a substantial nexus between the activity and the injury." *Criterion Claim Solutions*, 2021 WL 794787, at *5 (quoting *U.S. Specialty Ins. Co. v. Sussex Airport, Inc.*, No. 14-5494, 2016 WL 2624912, at *3 (D.N.J. May 6, 2016)).

Here, there is no doubt that the allegations alleged in the *Spirit Receivership* Action arise

---

[6]     *Criterion Claim Solutions* also involved insureds seeking a declaration that their insurer must defend them in the *Spirit Receivership* Action. The plaintiffs there were Criterion Claim Solutions, Inc., a claims management company that acted as a third-party administrator for Spirit and Mulligan. 2021 WL 794787, at *1–2. While the insolvency exclusion in that case differs from the one at issue here, the district court held that the *Spirit Receivership* Action "is excluded from coverage under the Scottsdale Policy because it arises out of or in some way involves Spirit's insolvency." *Id.* at *7.

from Spirit's insolvency. *Accord Criterion Claim Solutions*, 2021 WL 794787 at *7. Indeed, that complaint alleges Mulligan and the CTC Plaintiffs, *inter alia*, "operated a multitude of interrelated companies in the insurance service industry for their own benefit and to the detriment of their customers and insureds, including Spirit." (*Spirit Receivership* Compl. ¶ 1.) This scheme involved "a web of interrelated companies that wrote insurance policies, provided so-called financing for insureds wishing to purchase insurance, processed insurance premiums, and/or adjusted and paid insurance claims, and collected Spirit's assets." (*Id.* ¶ 2.) The *Spirit Receivership* complaint claims that "[a]s a result of this scheme, Spirit . . . became financially insolvent and was placed into permanent receivership and subsequently into liquidation, leaving hundreds of unpaid claims and a host of creditors." (*Id.* ¶ 4.) Nor does there appear to be any dispute that Spirit is an auto liability insurer operating as a risk retention group. (*See* Pls.' SUMF ¶¶ 1, 6 (noting that Spirit "is a risk retention group" and that "Spirit transacted commercial auto liability insurance business").)

What is disputed, however, is whether Plaintiffs "placed or obtained coverage for a client or account" with Spirit. (*See* QBE Moving Br., at 37; Pls.' Opp., at 23–27.) QBE, relying on allegations set forth in the *Spirit Receivership* complaint, contends that the CTC Plaintiffs placed or obtained coverage for accounts because they "participated in the unauthorized writing of insurance coverage for Mexican insureds that was placed with Spirit." (See QBE Reply, at 31; QBE Moving Br., at 37.) Further, QBE highlights that Spirit's reinsurance agreement states that that CTC California was Spirit's insurance producer, (*see* ECF No. 47-13, at 4–5 (setting forth that reinsurance policy applies to "covering insureds involved in interstate trucking produced and/or underwritten by CTC Transportation Insurance Service, Inc.")), and that the Program Administrator Agreement states that the CTC Plaintiffs were responsible for "the marketing and underwriting of policies, endorsements, notices of cancellation, notices of nonrenewal, coding,

premium collection and all related activities incidental to the issuance of policies in the authorized classes of business and the marketing of the program." (ECF No. 47-18, sec. 5(A).)  Moreover, QBE notes that the Program Administrator Agreement refers to those for whom the CTC Plaintiffs quoted coverage with Spirit as "clients."  (*Id.*, Addendum A, ("All compensation is calculated from the base premium quoted to a prospective client.").)  Plaintiffs, however, contend that the Insolvency Exclusion does not apply because the CTC Plaintiffs were not acting as insurance brokers and, rather, worked only for Spirit.  (Pls.' Opp., at 25–26.)  In that regard, Plaintiffs contend that only insurance brokers "place or obtain coverage for a client or account."  (Pls.' Reply, at 10–11.)  In other words, Plaintiffs maintain that the Insolvency Exclusion has no application to the CTC Plaintiffs because they "place or obtain coverage" *for* Spirit, not *for* "a client or an account."  (Pls.' Opp., at 26.).

Having reviewed the Primary Policies as a whole, I find that it is unclear whether the Insolvency Exclusion applies to bar coverage for the *Spirit Receivership* Action.  In that regard, there are questions of fact that preclude the application of the Insolvency Exclusion to Plaintiffs at this juncture.  The Insolvency Exclusion applies where the CTC Plaintiffs "placed or obtained coverage for a client or an account."  (Compl., Ex. 1, Section III.L.)  Specifically, I find that there are multiple reasonable meanings for the phrase "client or an account" in this context.  First, as Plaintiffs argue, "client or an account" could be interpreted to mean the client or account of an insurance broker who is communicating with the CTC Plaintiffs to obtain coverage for the broker's client.  In that regard, it is the insurance broker that is obtaining coverage for a client, not the CTC Plaintiffs.  QBE, on the other hand, argues that "client or account" refers to any insured for whom the CTC Plaintiffs underwrote coverage.  Compounding the confusion, the policies do not define these terms.  Because there are no definitions for these terms, I find both QBE and Plaintiffs'

readings of the Insolvency Exclusion to be an "objectively reasonable reading of the disputed passage." *Pittson Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 520 (3d Cir. 1997).

Indeed, the ambiguity in the Primary Policies is similar to the ambiguities found in the policy at issue in *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82 (2d Cir. 1998).[7] *Alexander & Alexander* involved an insurance brokerage conglomerate, A&A, that had purchased an errors and omissions policy from the defendant. *Id.* at 84. A&A had placed insurance with a Pennsylvania insurer which, because of financial incapacity, was placed under rehabilitation. *Id.* at 84–85. Additionally, a subsidiary of A&A had acted as the general managing agent for the Pennsylvania insurer. *Id.* at 85. The defendant insurer denied coverage for the rehabilitation action pursuant to an insolvency exclusion that stated that the policy would not cover "any claim arising from the financial inability to pay of any insurer or reinsurer with which [A&A] has placed or obtained coverage for a client or an account." *Id.* at 84. Applying New York law and considering the specific factual scenario before it, the Second Circuit found the exclusion to be "fraught with ambiguities." As the court explained:

> We are uncertain of the meaning of "coverage placed or obtained;" uncertain of the meaning of "client or account," and uncertain whether there must be a relationship or nexus between a claim asserted in the [underlying] case and not paid because of insolvency and coverage placed or obtained or underwritten by A&A.

*Id.* at 89. Specifically, the *Alexander* court questioned whether "client or account" referred solely to A&A's brokerage clients, *i.e.*, insureds for whom A&A obtained coverage, or whether it referred to A&A's brokerage clients *and* all insureds for whom A&A's subsidiary underwrote coverage. *Id.* at 87. The same ambiguities are presented here—the Primary Policies are unclear with respect

---

[7]    While *Alexander & Alexander* involved interpretation of an insurance policy under New York law, I find the court's reasoning persuasive and, therefore, rely on it here.

to *whose* client or account the Insolvency Exclusion applies—whether the client or account refers to the insured for whom CTC underwrote policies, or, more narrowly, whether the terms refer to a client, *i.e.*, the person who purchased the commercial automobile insurance policy, of an insurance broker. These questions demonstrate the genuine ambiguity of the exclusion.

However, I find that the record is not sufficiently developed to resolve that ambiguity at this time. While under the doctrine of *contra proferentum*, ambiguities in an insurance policy are to be resolved in favor of the insured, "[a]n exception to that rule exists for sophisticated commercial entities that do not suffer from the same inadequacies as the ordinary unschooled policyholder and that have participated in the drafting of the insurance contract." *Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 179 N.J. 87, 102 (2004); *see also Pittson*, 124 F.3d at 521 (3d Cir. 1997) ("[A] sophisticated insured . . . cannot seek refuge in the doctrine of strict construction by pretending it is the corporate equivalent of the unschooled, average consumer." (omission in original) (quoting *Owens-Illinois, Inc. v. United Ins. Co.*, 198 N.J. 437, 650 (1994)). Here, it is clear that the CTC Plaintiffs, as program administrators for a risk retention group, are sophisticated with regard to insurance. Moreover, it appears that the Primary Policies were procured through an insurance broker. (*See* ECF No. 13-3, at 24.) At this stage, no discovery has been exchanged, and the Court cannot weigh any evidence on the construction of these terms. *See Benjamin Moore*, 179 N.J. at 102; *see also Werner Indus., Inc. v. First State Ins. Co.*, 112 N.J. 30, 38 (1988) (declining to construe policy in favor of insured where the policy covered "commercial risks procured through a broker, and thus involved parties on both sides of the bargaining table who were sophisticated with regard to insurance"). Accordingly, I find it premature to rule on the question of whether the Insolvency Exclusion bars coverage for the *Spirit Receivership* Action. Thus, both QBE's motion for judgment on the pleadings and Plaintiffs' motion for partial summary

judgment based on the Insolvency Exclusion are denied. The parties may move for summary judgment on the issue at the appropriate time following discovery.

### iii. *The Business Enterprise Exclusion*

QBE additionally contends that the Business Enterprise Exclusion, as set forth in each of the Primary Policies, bars coverage for the *Spirit Receivership* Action. That exclusion provides that QBE will not provide coverage for any claim

> based upon or arising out of **Professional Services** performed for any organization if at the time the **Professional Services** were rendered:
>
> > 1. any **Insured** operated or managed such organization other than the Named Insured;
> >
> > 2. any **Insured** was a principal, partner, officer, director, trustee, member, manager or employee of such organization;
> >
> > 3. any **Insured** owned, directly or indirectly, ten percent (10%) or more if such organization is publicly held or thirty percent (30%) or more if such organization is a privately held organization;
> >
> > 4. such organization directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the Named Insured.

(Compl., Ex. 1, Section III.D.)

Specifically, QBE argues that this exclusion bars coverage because "the customer to which the CTC [Plaintiffs] provided insurance services – Spirit – became a business partner with the CTC [Plaintiffs] and Mulligan in many financial transactions." (Moving Br., at 22.) In that regard, QBE submits that each part of the Business Enterprise Exclusion applies independently to bar coverage because "(1) the CTC [Plaintiffs] and individual insureds operated and managed Spirit, (2) the individual insureds were principals, officers, directors, members or managers of Spirit, (3)

the insureds allegedly owned Spirit, and (4) Spirit was directly or indirectly controlled by, and was under common control with, the CTC [Plaintiffs]." (QBE Moving Br., at 2.) Plaintiffs do not dispute that the *Spirit Receivership* is based on or arises out of professional services, as defined under the Primary Policies, rendered to Spirit by Plaintiffs. Nor do Plaintiffs challenge the Business Enterprise Exclusion as ambiguous or otherwise unenforceable. Rather, Plaintiffs argue that the exclusion applies only if the conditions set forth in parts 1 to 4 of the exclusion were "met" at the time the professional services were performed. Plaintiffs contend that resolution of that question is fact sensitive and that "[i]t is not clear from the face of the complaint in the [*Spirit Receivership* Action] whether the conditions . . . were 'met' *at the time* Plaintiffs performed professional services for Spirit."[8] (Pls.' Opp., at 17–18.)

I first turn to the question of who is an "Insured" under the Primary Policies. There is no dispute that the CTC Plaintiffs and Mulligan are considered "Insureds." However, QBE contends that if other individuals named as defendants in the *Spirit Receivership* Complaint are "Insureds" under the Primary Policies, it does not have a duty to defend the CTC Plaintiffs.[9] Specifically, the parties dispute whether Matthew Simon, who served as a President of Spirit, a director of Spirit, and the Chief Operating Officer of CTC California; Daniel George, who was a director and officer of Spirit and an Executive Vice President of CTC California; Scott McCrae, who was an Executive Vice President of the CTC Plaintiffs and became the President of CTC California in January 2019;

---

[8] Plaintiffs additionally challenge application of the Business Enterprise Exclusion because, they argue, QBE relies on hearsay allegations from the underlying complaint in the *Spirit Receivership* Action. (Pls.' Opp. Br., at 47.) Whether an insurer has a duty to defend, however, is "determined by comparing the allegations in the complaint with the language of the policy." *inVentiv Health Clinical*, 826 F. App'x at 202. That is, the underlying complaint, as well as other relevant extrinsic evidence, controls whether there is a duty to defend an insured. *Id.*

[9] Whether these individuals are "Insureds" does not affect QBE's duty to defend Mulligan.

and Brenda Guffey, who was a President of Spirit and an employee of the CTC Plaintiffs, are "Insureds" under the Primary Policies. (*See Spirit Receiver* Compl. ¶¶ 36–43.) The *Spirit Receivership* Action asserts claims against these individuals, in their individual capacity, in addition to alleging that "George, Guffey, Simon, McCrae and other management defendants of CTC and Spirit continued to conceal the true financial condition of Spirit, its misrepresentations to policyholders, and the wrongful financial transactions of Spirit and CTC so that they could continue Spirit and CTC in business." (*Id.* ¶ 63.) Because the Primary Policies include in the definition of "Insured" a current or past officer, director, manager or employee of the CTC Plaintiffs, QBE maintains that Simon, George, McCrae, and Guffey are insured persons under the Primary Policies. Plaintiffs, on the other hand, argue that Simon, George, McCrae, and Guffey only qualify as "Insureds" under the Primary Policies where they were acting "on behalf of the Named Insured" and "within the scope of their duties as such." (Pls.' Opp., at 19.)

The Primary Policies define "Insured," as relevant here, as "any past or current principal, partner, officer, director, trustee, shareholder or employee of the Named Insured or its Predecessor Organization solely while acting on behalf of the Named Insured or its Predecessor Organization and with the scope of their duties as such." (Compl., Ex. 1, Section XII.G.) Based on a review of the *Spirit Receivership* Complaint, I find that there are questions of fact as to when Simon, George, McCrae, and Guffey held their respective positions at Spirit and CTC and whether they held those positions at the same time. In other words, it is unclear whether the conduct of Simon, George, McCrae, and Guffey, to the extent it forms a basis for the claim against the CTC Plaintiffs, occurred while Simon, George, McCrae, and Guffey were acting on behalf of the CTC Plaintiffs and within the scope of their duties for the CTC Plaintiffs. Indeed, in alleging the various roles held by George, Simon and Guffey, the *Spirit Receivership* Complaint includes no dates and, simply, states

that that they held their respective positions "at relevant times." In that regard, to the extent the claims against the CTC Plaintiffs in the *Spirit Receivership* are based on the actions of Simon, George, McCrae, and Guffey, I cannot find that the Business Enterprise Exclusion unambiguously bars coverage at this time. In other words, I cannot, based on the facts before me, determine whether George, Simon, Guffey, and McCrae (1) operated and managed Spirit, (2) were principals, officers, directors, members or managers of Spirit, or (3) owned Spirit, while they acted on behalf of the CTC Plaintiffs.

As there is apparently no dispute that Mulligan is an "Insured" under the Primary Policies, I turn to whether the Business Enterprise Exclusion bars coverages based on Mulligan's conduct. Application of each of the conditions of the Business Enterprise Exclusion with respect to Mulligan's conduct is also fraught with factual questions. First, QBE argues that the first condition of the Business Enterprise Exclusion bars coverage for claims arising from Mulligan's conduct because the *Spirit Receivership* Action alleges that Mulligan operated or managed Spirit and was "at relevant times . . . a manager, officer, or director of Spirit; . . . CTC California; . . . CTC Hawaii; . . . and CTC Missouri." (*Spirit Receivership* Compl. ¶ 10.) Plaintiffs, however, contest whether Mulligan operated or managed Spirit and, instead, maintain that under Spirit's bylaws, only Spirit's named officers and directors "operated and managed" Spirit. (Pls.' Opp., at 20.) On the second condition, QBE points to the allegation that "Mulligan . . . at relevant times was a manager, officer or director of Spirit." (*Spirit Receivership* Compl. ¶ 10.) Plaintiffs, however, through affidavit of Mulligan and by relying on various filings made by Spirit, contend that Mulligan was never a "principal, partner, officer, director, trustee, manager or employee of" of Spirit or any other organization at the time the professional services giving rise to the [*Spirit Receivership* Action] were performed." (*See* Pls.' Opp., at 20–21.) Next, QBE submits that the third condition is met

because the Spirit Receiver alleges that Mulligan owns Spirit. (QBE Reply, at 25 (citing *Spirit Receivership* Compl. ¶ 129).) Plaintiffs, however, point to extrinsic evidence that demonstrates that Spirit is wholly owned by the members of its association. (Pls.' Opp., at 21.) And, finally, QBE argues that the fourth condition is met based on the Receiver's allegations that Mulligan "dominated and controlled the affairs of CTC and Spirit and other Related Entities." (QBE Reply, at 26.) Again, Plaintiffs dispute the factual basis for those allegations and contend that, at the time Plaintiffs provided Professional Services to Spirit, neither Mulligan nor the CTC Plaintiffs controlled Spirit or were under common control with Spirit. (Pls.' Opp., at 21.)

I cannot resolve these factual disputes on QBE's motion for judgment on the pleadings under Rule 12(c). A motion for judgment on the pleadings should only be granted where "the movant clearly establishes that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008). In other words, "[j]udgment on the pleadings is appropriate only when 'all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.'" *Huertas v. United States*, No. 04-3361, 2005 WL 719143, at *7 (D.N.J. July 5, 2005) (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367). Defendant has not made that showing here because, as set forth above, there remain disputes of material fact that must be resolved for the Court to determine whether the Business Enterprise Exclusion applies to bar coverage for the *Spirit Receivership* Action. *See, e.g.*, *Citizens Ins. Co. of Am. v. Selective Way Ins. Co.*, 98 F. Supp. 3d 782, 788–89 (E.D. Pa. 2015) (denying motion for judgment on the pleadings where plaintiff could not "show that there is not at least a question of fact regarding whether [insured] is entitled to coverage"). For the same reasons, I deny Plaintiffs' motion for partial summary judgment on the duty to defend.

*CAMICO Mut. Ins. Co. v. Baratz & Assocs.*, No. 14-3160, 2015 WL 248264, at *4 (D.N.J. Jan. 20, 2015) (denying summary judgment where genuine disputes of material fact existed as to whether insurance policy exclusion applied to bar coverage); *Landmark Am. Ins. Co. v. Rider Univ.*, No. 08-1250, 2010 WL 4063199, at *6 (D.N.J. Oct. 15, 2010) (denying summary judgment where there was a question of fact as to whether "each of the Individual Defendants actually participated in the hazing, *i.e.*, the excluded event, or if they merely participated in the events that flowed therefrom").

In sum, because I find that questions of fact exist regarding the scope and application of both the Insolvency and Business Enterprise Exclusions, both QBE's motion for judgment on the pleadings and Plaintiffs' partial motion for summary judgment on the duty to defend are denied. *See, e.g.*, *CAMICO Mut. Ins. Co.*, 2015 WL 248264, at *4 (denying motion for summary judgment on duty to defend where there were questions of fact as to whether exclusion applied to bar coverage); *Landmark Am. Ins. Co.*, 2010 WL 4063199, at *6 (denying motions for summary judgment on duty to defend where there were questions of fact that precluded application of the at-issue policy exclusion); *see also Foster v. Westchester Fire Ins. Co.*, No. 09-1459, 2011 WL 4382971, at *14 (W.D. Pa. Sept. 20, 2011) ("Based upon the foregoing discussion, the existence of questions of fact regarding the extent of plaintiff's subjective knowledge prior to applying for, and receiving, insurance from Westchester and Plus Companies precludes summary judgment with respect to defendants' duty to defend.").

## IV.    CONCLUSION

For the reasons set forth herein, the Motions for Judgment on the Pleadings filed by QBE, Argo, and Capital are **DENIED**.  The Motions for Joinder of QBE's Motion for Judgment on the Pleadings filed by Axis and Maxum are **GRANTED**.  Plaintiffs' Cross-Motion for Partial

Summary Judgment is **DENIED**.  An appropriate Order accompanies this Opinion.

DATED: June 28, 2021                                                   /s/ Freda L. Wolfson
                                                                       Freda L. Wolfson
                                                                       U.S. Chief District Judge